# IN THE SUPREME COURT OF IOWA

No. 10–1955

Filed February 17, 2012

**STATE OF IOWA,**

Appellant,

vs.

**RACHAEL OVERBAY,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Cynthia M. Moisan, Judge.

The State seeks further review of a court of appeals decision affirming a district court ruling granting defendant's motion to suppress the results of a chemical blood test. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT RULING REVERSED AND CASE REMANDED.**

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, John P. Sarcone, County Attorney, and Brendan E. Greiner, Assistant County Attorney, for appellant.

Mark C. Smith, State Appellate Defender, and Rachel C. Regenold, Assistant State Appellate Defender, for appellee.

**MANSFIELD, Justice**.

This case presents the question whether a motorist is entitled to suppression of her blood alcohol test results because she was informed, incorrectly, that her refusal of the requested chemical test would have automatically led to revocation of her driving privileges, when in fact her refusal of the blood test would not have been deemed final but would have led to her being offered a different chemical test. Consistent with our precedents, we conclude that inaccurate information does not render a driver's consent involuntary when the record indicates that the inaccuracy did not affect the driver's decision. For this reason, we reverse the district court's decision to grant the driver's motion to suppress, vacate the decision of the court of appeals, and remand for further proceedings.

### I. Factual Background and Procedural History.

On June 25, 2010, at approximately 12:43 in the morning, Trooper Tyson Underwood of the Iowa State Patrol was dispatched to the scene of a single-vehicle accident on Interstate 80. Emergency medical personnel from Altoona Fire and Rescue were already attending to the injured party, Rachael Overbay, as she lay in a grassy area of the median. According to Underwood, Overbay "was very loud, crying [and] screaming." She did admit to being the driver of the vehicle.

Trooper Underwood noticed that Overbay emitted a "strong alcoholic beverage odor" and her speech was "very slurred and mumbled." Overbay admitted she had been drinking at the Yankee Clipper in Ankeny. The trooper did not request field sobriety tests at the scene of the accident because he was uncertain as to the extent of Overbay's injuries and whether she would be able to perform the tests in

her condition. Overbay was transported by ambulance to Mercy Hospital.

Trooper Underwood met Overbay in the emergency room of the hospital about fifteen minutes later and continued his investigation. When he arrived, Overbay was being treated by medical personnel. At that time, she was strapped to a backboard on a hospital bed, with a brace on her neck and tubing in her nose. Overbay also had a urinary catheter inserted, although Underwood was not aware of this. According to Underwood, Overbay was "still very loud" and "out of sorts," and the nurses were trying to calm her down.

Trooper Underwood asked Overbay to submit to a horizontal gaze nystagmus test. She declined. Underwood did not ask Overbay to perform the other field sobriety tests (the walk and turn test or the one-leg stand test) because of her medical condition. Underwood also asked Overbay for permission to conduct a preliminary breath test (PBT) under Iowa Code section 321J.5 (2009), but she apparently refused this test.

Trooper Underwood invoked implied consent under Iowa Code section 321J.6. He requested a blood sample from Overbay and read the implied consent advisory required by section 321J.8 out loud to her, handing her a copy. Although the form itself is not in the record, it is not disputed that Overbay received the standard advisory based on the statutory language of section 321J.8. This advisory told Overbay that if she refused to submit to the chemical test, her license would be revoked for one year if she had no prior revocations within the previous twelve years, or two years if she had. The advisory also told Overbay that if she submitted to the test and an alcohol concentration of eight hundredths or more was found, her license would be revoked for 180 days if she had

no previous revocations within the previous twelve years, or one year if she had.

State law provides that "refusal to submit to a chemical test of blood is not deemed a refusal to submit, but in that case, the peace officer shall then determine which one of the other two substances [urine or breath] shall be tested and shall offer the test." Iowa Code § 321J.6(2). However, Underwood did not specifically tell Overbay that if she refused the blood test, he would then have requested a urine test before deeming her refusal to be final. Instead, as noted, Underwood provided an advisory which tracks the language of section 321J.8 and simply refers to "chemical" testing without distinguishing the types of chemical tests.

Overbay verbally agreed to provide the blood sample. The sample was tested by the DCI Criminalistics Laboratory. The results showed a blood alcohol content of .178, more than twice the legal limit.

On September 1, 2010, the State filed a trial information charging Overbay with operating a motor vehicle while under the influence of alcohol (OWI)–second offense, an aggravated misdemeanor in violation of Iowa Code section 321J.2(2)(*b*). On October 15, 2010, Overbay filed a timely motion to suppress the result of her blood test. An evidentiary hearing was held on October 29, 2010. Overbay did not testify at the suppression hearing. Trooper Underwood testified, as did a friend of Overbay's who had visited Overbay that night at the hospital. Underwood confirmed that the official consent notice he read did not state that if the defendant refused to provide a blood sample, this alone would not lead to revocation.

However, Trooper Underwood testified that if the defendant had refused a blood test, he would then have requested a urine test. (A

breath test would not have been feasible because there was no DataMaster at the hospital.)  Underwood stated that it is the policy of the Iowa State Patrol to request a blood sample first in this instance:

> Q.  Did you request a urine sample?  A.  No, in this instance we request blood first and then if they refuse the blood, then I would have requested urine.
>
> . . . .
>
> Q.  Did it seem to you it would have been—she was in a condition where a urine sample would be easily obtained?  A.  I'm not quite sure.  I didn't pay attention to that because she consented to the blood sample, so I proceeded with a blood sample, therefore, I didn't pay any attention to the possibility of a urine specimen.
>
> Q.  Prior to requesting the blood sample, did you even consider requesting a urine sample?  A.  I would have considered it if she would have refused the blood because that's our procedure, but up to that point, no, I didn't think of anything about a urine specimen.
>
> Q.  You didn't even consider it prior to asking for blood?  A.  No, because our procedure, like I said, is blood first.  If they refuse that, then I would go to urine.
>
> Q.  Is that written procedure?  A.  That's what the DCI lab requests, that's the way I've been trained.

On November 9, 2010, the district court granted Overbay's motion to suppress, finding that although the trooper had reasonable grounds for invoking implied consent, Overbay's consent to the blood test was not voluntary because it was based on "misleading information."  On December 3, 2010, the State filed an application for discretionary review.  On December 16, 2010, we granted the application and ordered a stay of the district court proceedings.  We subsequently transferred the case to the court of appeals.

On August 24, 2011, the court of appeals issued a decision, with one judge dissenting, that affirmed the district court's suppression order.  The court of appeals majority first noted Overbay had been given a

"misleading" implied consent advisory because the advisory failed to inform her a refusal to provide the blood sample would not have been a basis by itself for license revocation. The court then turned to the State's argument that the misleading advisory was of no consequence. According to the State, if Overbay had refused the blood test she would have been asked to provide a urine sample. Her refusal or consent to that test would have been dispositive, and if she had consented, the test results would have been the same as for blood. Thus, in the State's view, failing to tell Overbay that her refusal to consent to blood testing would not have been deemed a refusal of consent to all testing did not matter.

The court of appeals, however, rejected this argument. It noted that the State failed to present evidence that it "*could* have obtained urine" from Overbay under the circumstances. Accordingly, based on the misleading advisory, that court found that Overbay's consent to the blood test was involuntary.

We granted the State's application for further review.

## II. Standard of Review.

"When a defendant who has submitted to chemical testing asserts that the submission was involuntary, we evaluate the totality of the circumstances to determine whether or not the decision was made voluntarily." *State v. Garcia*, 756 N.W.2d 216, 219 (Iowa 2008). Our review is de novo, *State v. Hutton*, 796 N.W.2d 898, 902 (Iowa 2011); therefore, we make an independent evaluation based on the entire record, *State v. Ochoa*, 792 N.W.2d 260, 264 (Iowa 2010). We give considerable weight to the district court's assessment of voluntariness but are not bound by its factual findings. *State v. Gravenish*, 511 N.W.2d 379, 381 (Iowa 1994). Where questions of statutory

interpretation arise, we review for correction of errors at law. *Garcia*, 756 N.W.2d at 220.

**III. Analysis.**

**A. Iowa's Implied Consent Law.** The operation of a motor vehicle while under the influence of an alcoholic beverage or while having an alcohol concentration of .08 or more is an offense under Iowa law. Iowa Code § 321J.2. Iowa Code section 321J.6, titled "Implied consent to test," establishes the authority of a peace officer to test the breath, blood or urine of any person suspected of driving while intoxicated. It provides that when there are "reasonable grounds to believe that the person has been operating a motor vehicle in violation of section 321J.2 or 321J.2A [that person] is *deemed to have given consent* to the withdrawal of specimens." *Id.* § 321J.6(1) (emphasis added). The premise of this statute is that a driver "impliedly agrees to submit to a test in return for the privilege of using the public highways." *State v. Hitchens*, 294 N.W.2d 686, 687 (Iowa 1980).

The primary purpose of the implied consent statute is the removal of intoxicated drivers from Iowa's roads in order to protect public safety. *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 594 (Iowa 2011). The law "was enacted to help reduce the appalling number of highway deaths resulting in part at least from intoxicated drivers." *State v. Wallin*, 195 N.W.2d 95, 96 (Iowa 1972); *see also Severson v. Sueppel*, 260 Iowa 1169, 1174, 152 N.W.2d 281, 284 (Iowa 1967) ("It is obvious the purpose of the Implied Consent Law is to reduce the holocaust on our highways part of which is due to the driver who imbibes too freely of intoxicating liquor."). We have held that the procedures provided by the implied consent statute "are reasonably calculated to further this objective." *State v. Knous*, 313 N.W.2d 510, 511–12 (Iowa 1981).

Although drivers are deemed to have impliedly consented to testing, they nonetheless generally have the statutory right to withdraw that consent and refuse to take any test. *State v. Massengale*, 745 N.W.2d 499, 501 (Iowa 2008), *abrogated on other grounds by Hutton*, 796 N.W.2d at 904 n.4. "If a person refuses to submit to the chemical testing, a test shall not be given . . . ." Iowa Code § 321J.9(1). Valid consent therefore must be given voluntarily with the decision to submit to a chemical test being "freely made, uncoerced, reasoned, and informed." *Garcia,* 756 N.W.2d at 220. "The ultimate question is whether the decision to comply with a valid request under the implied-consent law is a reasoned and informed decision." *State v. Bernhard*, 657 N.W.2d 469, 473 (Iowa 2003).

"[B]ecause there are both administrative and criminal repercussions for submitting to or refusing a chemical test, section 321J.8 requires an officer to advise the person of certain consequences that may result from the decision." *Hutton*, 796 N.W.2d at 902. Iowa Code section 321J.8 provides:

> 1. A person who has been requested to submit to a chemical test shall be advised by a peace officer of the following:
>
> *a.* If the person refuses to submit to the test, the person's driver's license or nonresident operating privilege will be revoked by the department as required by and for the applicable period specified under section 321J.9.
>
> *b.* If the person submits to the test and the results indicate the presence of a controlled substance or other drug, or an alcohol concentration equal to or in excess of the level prohibited by section 321J.2 or 321J.2A, the person's driver's license or nonresident operating privilege will be revoked by the department as required by and for the applicable period specified under section 321J.12.

Thus, the officer must inform the motorist of the potential periods of license revocation associated with refusal to take the test or with a positive test result. *Voss v. Iowa Dep't of Transp.*, 621 N.W.2d 208, 211 (Iowa 2001).

> The clear intent of section 321J.8 is to provide a person who has been required to submit [to] a chemical test a basis for evaluation and decision-making in regard to either submitting or not submitting to the test. This involve[s] a weighing of the consequences if the test is refused against the consequences if the test reflects a controlled substance, drug, or alcohol concentration in excess of the "legal" limit.

*Id.* at 212 (internal quotations marks omitted).

The peace officer, not the accused driver, has the authority to choose which type of chemical test is administered. Iowa Code § 321J.6(2) (providing that "[t]he peace officer shall determine which of the three substances, breath, blood, or urine, shall be tested"); *Gottschalk v. Sueppel*, 258 Iowa 1173, 1183–85, 140 N.W.2d 866, 872–73 (Iowa 1966) (noting the concern that a driver could insist upon an unavailable test and observing that "[a]ll the starch would be taken out of the law if arrested drivers could pick and choose the type of test to be taken"). Thus, section 321J.6(2) provides, "Refusal to submit to a chemical test of urine or breath is deemed a refusal to submit, and section 321J.9 applies."

However, the same is not true with blood: "A refusal to submit to a chemical test of *blood* is not deemed a refusal to submit, but in that case the peace officer shall then determine which one of the other two substances shall be tested and shall offer the test." Iowa Code § 321J.6(2) (emphasis added). An accused driver has an "absolute right to refuse to take a blood test provided that he is willing to submit to a secondary test or tests chosen by the officer." *Rodriguez v. Fulton*, 190

N.W.2d 417, 419 (Iowa 1971). This exception was added by the legislature "primarily [as] an accommodation to those motorists whose religious beliefs or physical condition make the blood test unsuitable." *Id.* However, if the driver refuses the blood test, the officer is required by law to offer another test. Iowa Code § 321J.6(2).

**B. *State v. Bernhard.*** The central issue raised by Overbay is the apparent inconsistency between the language of the implied consent advisory mandated by section 321J.8 and the freedom to refuse a blood test granted by section 321J.6(2). The implication of the consent advisory required by section 321J.8 is that license revocation will result from the refusal to submit to any one of the three tests. However, section 321J.6(2) specifically exempts a stand-alone blood test refusal from the penalty of revocation, since it "is not deemed a refusal to submit." *Id.* Overbay maintains that she was misinformed about her rights under section 321J.6(2) because the language of the implied consent advisory implied she was required to submit to a blood test or face license revocation. Because of this misinformation, she claims her consent was not voluntary and that to hold otherwise would undermine the purpose of section 321J.8, which guarantees the accused an opportunity to make a reasoned and informed decision about chemical testing.

In *Bernhard*, we addressed this issue under similar facts. Bernhard was injured in an accident, and evidence at the scene indicated that he had been driving while intoxicated. *Bernhard*, 657 N.W.2d at 470. He was "immobilized in a C-collar and on a backboard" and taken by ambulance to a hospital emergency room. *Id.* He complained of numerous pains and was described by the nurse as "very agitated, nervous, and beset with rapid speech patterns." *Id.* A state trooper

requested a blood sample and read the implied consent advisory, but did not give the defendant a copy. *Id.* at 471. Although Bernhard was unable to sign as he was being treated for injuries, he extended his arm and consented to the blood test. *Id.*

Bernhard later argued that "because his consent to providing a sample of blood was obtained by an unwarranted threat of license revocation, the results of the chemical test should have been suppressed." *Id.* at 472. We disagreed, stating:

> Although we recognize that the general admonition concerning license revocation that was read to defendant was misleading when given with respect to a request for blood, it was correct within the context of the complete statutory procedure that defendant was facing.

*Id.* As we explained:

> If . . . defendant had refused to provide a sample of blood the implied consent procedure would have merely shifted to a request for a urine or breath sample. Defendant would have been required to provide a sample of one of those substances or face the revocation of his license. Defendant conceded at the suppression hearing that he was motivated to agree to a blood test because of the desire not to lose his license. We find no reason to assume that his choice would have been different had he been requested to provide a sample of one of the other two substances. Nor is there reason to believe that a chemical test of an alternative substance would not have revealed a similar concentration of alcohol in defendant's system.

*Id.* We concluded that "the only real detriment that may have befallen defendant was unwittingly consenting to a blood test when he may have preferred one of the alternative tests" and that this was insufficient to justify suppression of the test results. *Id.* at 472–73.

We also reiterated our previously stated view that "not every inaccurate depiction by law enforcement officers that might bear on a subject's election to submit to chemical testing is a basis for suppressing

the test results." *Id.* at 473 (citing *Gravenish*, 511 N.W.2d at 381). Accordingly, we concluded that Bernhard's consent to a blood test was voluntary and that the district court had correctly denied Bernhard's motion to suppress. *Id.*

**C. Applying *Bernhard* to Overbay's Claim.** As we have noted, this case bears many factual similarities to *Bernhard.* Both defendants were injured, extremely agitated, and immobilized in hospital emergency rooms. Both were read the statutorily required implied consent advisory, and both agreed to submit to a blood test.

Overbay, however, argues that her case is ultimately distinguishable from *Bernhard* and is more similar to an unpublished court of appeals decision on which the district court relied. *See State v. Michaloff*, No. 09–1413, 2010 WL 2080113 (Iowa Ct. App. May 26, 2010). In particular, Overbay argues there is no evidence she was motivated to take the blood test out of fear of losing her license. *Cf. Bernhard*, 657 N.W.2d at 472 (noting that Bernhard conceded this point). Also, Overbay maintains it is speculative whether a urine sample could have been obtained from her because she had a catheter inserted.

Overbay's involuntary consent argument, therefore, must run something like this: If I had known that a refusal to consent to the blood test would *not* have triggered an immediate revocation of my license, I would have refused that test. Assuming that Trooper Underwood would have then requested a urine sample (which is undisputed on this record), I would have consented at that point but the police might have been unable to obtain a sample because of my medical condition. The resulting situation would be one where the State had no sample even though I had not "refused" the test. *See McCrea v. Iowa Dep't of Transp.*, 336 N.W.2d 427, 430 (Iowa 1983) (holding that a driver's consent to test

accompanied by a failure to provide a urine specimen was a refusal in the absence of a valid medical reason); *see also State v. Stanford*, 474 N.W.2d 573, 574–75 (Iowa 1991) (holding that a urine sample provided under threat of catheterization was obtained voluntarily because there was no coercion at the time the consent was given). Therefore, my consent to the blood test was involuntary.[1]

We are unwilling to engage in this kind of "House That Jack Built" reasoning here. First, based on common experience, we believe the presence of a urinary catheter makes it *more* likely urine could have been obtained, assuming Overbay consented for her urine to be tested. Second, while the State did not offer affirmative evidence that Overbay was motivated to consent to the blood test by fear of losing her license (not surprisingly, since Overbay exercised her right not to testify at the suppression hearing), no other reason appears in the record why Overbay would consent to the test. In short, we see no real basis for distinguishing this case from *Bernhard*. If Bernhard's consent was voluntary, so was Overbay's.

We draw further support for this conclusion from our recent opinion in *Hutton*. There, we considered a claim that a driver's consent to a chemical breath test was involuntary because the advisory "inaccurately represented the consequences of his decision to submit to the test or not." *Hutton*, 796 N.W.2d at 902. In that case, additional language in the advisory incorrectly overstated the potential adverse consequences of taking the chemical test. Specifically, it warned Hutton that his commercial driver's license (CDL) would be revoked for one year if he took the chemical test and failed it. *Id.* at 904. Despite this

---

[1]As previously noted, there was no DataMaster unit available at the hospital to conduct a breath test.

language, Hutton agreed to take the test anyway—and registered a .205 blood alcohol concentration. *Id.* at 901. We held under these facts that Hutton had no basis for arguing his consent to the test was involuntary. As we explained:

> [W]e are confident Hutton was not induced to consent to the test by the inclusion of the incorrect excess verbiage in the advisory. The excess verbiage should have discouraged Hutton from submitting to the test as he did. Accordingly, we find no grounds to conclude Hutton's consent was coerced or uninformed.

*Id.* at 906.[2]

This case is like *Hutton* in that the advisory was partially inaccurate. It failed to inform the motorist that refusal of the blood test would not result in automatic revocation of driving privileges but would instead result in the motorist being asked to take a different chemical test. Thus, the advisory slightly overstated the possible consequences of refusing to take the blood test. But as in *Hutton,* "we are confident" the motorist was not induced to take the blood test because of anything incorrect in the advisory. Had Overbay declined the blood test, she would have been immediately presented with the same choices with respect to a urine test. Overbay does not argue that her decision process at that point would have been any different.

We reiterate what we said in *Hutton*: "[I]t is optimal to include only perfectly accurate information in the advisory." *Id.* at 905–06. Still, a less-than-optimal advisory does not automatically render a consent involuntary. *Id.*

---

[2]In *Hutton*, we considered two arguments in addition to the defendant's claim that his consent to the testing was not voluntarily given. The defendant also maintained that the advisory he was given violated section 321J.8 and that the advisory violated his due process rights. *See Hutton,* 796 N.W.2d at 904–06. Neither of these arguments has been asserted by Overbay, either here or below. Overbay's only contention is that her consent was not voluntarily given.

We have also said before that the State has the burden to prove a consent to testing was voluntary. *Stanford*, 474 N.W.2d at 575; *see also Gravenish*, 511 N.W.2d at 381. However, if the record as a whole shows the defendant would have made the same choice to undergo (or not undergo) chemical testing even if provided a more accurate advisory, the State has met its burden. *See Hutton*, 796 N.W.2d at 906 (denying relief because "we are confident Hutton was not induced to consent to the test by the inclusion of the incorrect excess verbiage in the advisory"); *Bernhard*, 657 N.W.2d at 472 (denying relief because "[w]e find no reason to assume that [Bernhard's] choice would have been different had he been requested to provide a sample of one of the other two substances"); *Gravenish*, 511 N.W.2d at 381–82 (denying relief despite a factually misleading statement by the officer concerning the status of a victim injured by the defendant, noting that the defendant's "argument implies that, had he known Kautman's true condition, he would have withheld consent" but "[n]othing in the record . . . bears out this contention"); *Smith v. Iowa Dep't of Transp.*, 523 N.W.2d 607, 610 (Iowa Ct. App. 1994) (upholding revocation because "we find the mistake did not influence Smith's decision nor was he prejudiced thereby"); *cf. Massengale*, 745 N.W.2d at 503–04 (granting relief where the defendant's decision could have been influenced by the misleading advisory that omitted all information regarding consequences for the defendant's CDL); *State v. Kjos*, 524 N.W.2d 195, 197 (Iowa 1994) (granting suppression where the officer told the defendant that he had to submit to a test on pain of license revocation even though more than two hours had already passed since his arrest and therefore the defendant's license would not have been revoked if he had refused testing).

In sum, the lesson of our cases is that voluntariness of a consent is determined at the time consent is given, *Stanford*, 474 N.W.2d at 575, and voluntariness is not undermined by inaccurate information if the record indicates the information would not have affected the motorist's decision to submit to or refuse chemical testing. *See Hutton*, 796 N.W.2d at 906; *Bernhard*, 657 N.W.2d at 472; *Gravenish*, 511 N.W.2d at 381–82.

**IV. Conclusion.**

For the reasons stated, we vacate the decision of the court of appeals, reverse the ruling of the district court granting Overbay's motion to suppress, and remand for further proceedings consistent with this opinion.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT RULING REVERSED AND CASE REMANDED.**