# IN THE COURT OF APPEALS OF IOWA

No. 19-0894
Filed January 21, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DION CALDWELL,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Buena Vista County, Andrew Smith, District Associate Judge.

Dion Caldwell appeals his conviction for operating while intoxicated, third offense. **REVERSED AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Israel Kodiaga, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and May and Ahlers, JJ.

**MAY, Judge.**

A jury convicted Dion Caldwell of operating while intoxicated (OWI). On appeal, he argues (1) the evidence was insufficient to establish he was under the influence; (2) the district court erred in denying his motion to suppress; (3) evidence related to an ignition interlock device should have been excluded; and (4) court costs and jail fees were imposed without considering his reasonable ability to pay. We conclude sufficient evidence supported the conviction. But we also conclude evidence of Caldwell's refusal to submit a breath sample should have been suppressed. So we reverse and remand for a new trial.

**I. Background Facts and Proceedings**

On the evening of February 3, 2019, Storm Lake Police Officer Mitchel McDonald was travelling east in his marked patrol vehicle. He observed a westbound vehicle with its lights flashing and horn honking. Officer McDonald was concerned about what "was going on inside the vehicle, if there was an assault taking place . . . or if somebody was in danger." So he turned around and attempted to make a traffic stop to investigate.[1] When Officer McDonald turned on his emergency lights, the vehicle "took off at a high rate of speed." The vehicle then pulled into an off-street parking space outside a residential building. The driver, later determined to be Caldwell, exited the vehicle and began walking towards the building. Officer McDonald advised Caldwell to stop. Caldwell refused. So Officer McDonald attempted to handcuff him. Caldwell resisted and threatened physical violence against the officer. After a brief struggle, Officer

---

[1] A fellow officer later "noticed there was an intoxilyzer in [Caldwell's] vehicle" which can activate "the horn and lights" if it is "not used correctly."

McDonald placed Caldwell under arrest for interference with official acts. Officer McDonald then placed Caldwell in the back of his patrol vehicle.

During his close interaction with Caldwell, Officer McDonald noticed there was "a strong odor of . . . consumed alcoholic beverage coming from his person." But he felt it was unsafe to perform standard field sobriety tests (SFSTs) at the scene. So he transported Caldwell to the Buena Vista County Jail. Upon arrival, Officer McDonald took Caldwell to a hallway "within the jail facility" that is specially designated and marked for sobriety testing.[2] While transporting Caldwell inside the jail, Officer McDonald noted "that there was for sure a consumed odor of alcoholic beverage coming from his person" and "it was very noticeable that his eyes were bloodshot and watery as well."

Upon reaching the designated testing area, Officer McDonald removed Caldwell's handcuffs because "he need[ed] to have the ability to use his hands during the tests." Officer McDonald offered Caldwell a SFST called the "horizontal gaze nystagmus" test. Caldwell refused. Officer McDonald then offered Caldwell a different SFST, the "walk-and-turn" test. Caldwell asked to call his mother. Officer McDonald told Caldwell he could not make a phone call right now. Officer McDonald then offered the "walk-and-turn" test again, followed by the "one-leg stand" test. Caldwell refused both.

Officer McDonald placed Caldwell back in handcuffs and read him the implied consent advisory. Caldwell was then allowed to make phone calls in a

---

[2] Officer McDonald testified that the jail's sally port is slanted, making it unsuitable for SFSTs. So instead the hallway off the sally port is used. It has a straight line on the floor that is used to perform one of the tests.

separate room. The record shows that approximately five to six minutes passed between Caldwell's request to call his mother and the time when he was allowed to make phone calls.

Caldwell placed phone calls to his mother, his father, and his employer. Officer McDonald asked if he wanted to call anyone else. Caldwell stated that he had no other phone calls to make. But he refused to sign a document confirming he was allowed to make phone calls.

After Caldwell had completed his phone calls, Officer McDonald requested a sample of Caldwell's breath. Caldwell refused to give a sample of his breath on the DataMaster. He also declined to sign a document confirming his refusal. Officer McDonald advised Caldwell of his license revocation due to his refusal to provide a breath sample. Next, Officer McDonald read Caldwell his *Miranda*[3] rights. He then questioned Caldwell about his night.[4] Initially, Caldwell said he was not driving. But he later told Officer McDonald that he had been at a Super Bowl party, consumed mixed alcoholic drinks, fell asleep, and then drove home after taking one shot of liquor.

The State charged Caldwell with OWI, third offense, in violation of Iowa Code section 321J.2 (2019), and public intoxication, third offense, in violation of sections 123.46(2) and 123.91. Caldwell filed a motion to suppress his post-arrest refusals to the SFSTs and breath test. He claimed (1) a violation of Iowa Code section 804.20 occurred when Officer McDonald failed to provide him an

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] Officer McDonald testified that at this point, Caldwell was "under arrest for the interference" but he was still "investigating the operating while intoxicated" and "public intoxication" charges.

opportunity to make a phone call immediately after he requested one and (2) Officer McDonald lacked grounds to invoke the implied consent requirements of section 321J.6. The district court denied Caldwell's motion.

Caldwell also filed a motion in limine. Among other things, Caldwell sought an order prohibiting any reference to the ignition interlock device in his vehicle. The court sustained Caldwell's motion.[5] But then, over Caldwell's objection, the State was allowed to submit evidence that Caldwell's vehicle was observed with its horn honking and lights flashing—features that were thought to be connected to the improper use of the ignition interlock device.

A jury found Caldwell guilty of OWI. Caldwell then stipulated to having two previous OWI convictions. The court sentenced him to prison. And the court ordered Caldwell to pay court costs but waived his attorney fees after finding he did not have the reasonable ability to pay. Caldwell asked the court to also waive jail fees. The court ruled that Caldwell would only be required to pay thirty days of jail fees. Caldwell now appeals.

## II. Sufficiency of the Evidence

Caldwell first contends that "[t]he evidence presented at trial was insufficient to establish that [he] was 'under the influence' at the time he operated the motor vehicle." He alleges that his "state of excitement/non-cooperativeness [was] not the result of alcohol impairment but merely his indignant reaction to having been approached and arrested."

---

[5] Although the court sustained the motion in limine, the court left open "the opportunity of the State, outside of the presence of the jury, to submit proof of any statements of the defendant regarding the ignition interlock device which might appropriately be considered an admission."

"Because a jury verdict is binding on us when supported by substantial evidence, our appellate review is limited to the correction of errors at law." *State v. Speicher*, 625 N.W.2d 738, 740 (Iowa 2001). "Evidence is substantial if it could convince a rational jury of a defendant's guilt beyond a reasonable doubt." *Id.* at 741. We "consider all of the record evidence viewed 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (quoting *State v. Keopasaeuth*, 645 N.W.2d 637, 640 (Iowa 2002)).

Section 321J.2 criminalizes operating a motor vehicle while intoxicated. Here, the State alleged Caldwell operated a motor vehicle "[w]hile under the influence of an alcoholic beverage." *See* Iowa Code § 321J.2(1)(a). And the jury was appropriately instructed that:

> A person is "under the influence" and/or "intoxicated" when, by drinking liquor and/or beer, one or more of the following is true:
> 1. [the person's] reason or mental ability has been affected[,]
> 2. [the person's] judgment is impaired[,]
> 3. [the person's] emotions are visibly excited[, or]
> 4. [the person] has, to any extent, lost control of bodily actions or motions.

*See, e.g.*, *State v. Van Cleave*, No. 12-0041, 2013 WL 3458192, at *3 (Iowa Ct. App. July 10, 2013). So Caldwell's "conduct and demeanor" were "important considerations" in determining whether he was "under the influence." *See State v. Price*, 692 N.W.2d 1, 3 (Iowa 2005); *see also State v. Orr*, No. 05-1864, 2006 WL 2419198, at *2 (Iowa Ct. App. Aug. 23, 2006) ("A person may be found guilty under section 321J.2(1)(a) in the absence of admissible evidence from chemical tests.").

Caldwell admitted to having mixed drinks that night plus taking a shot of liquor before driving home. *See State v. Newton*, 929 N.W.2d 250, 255 (Iowa 2019) ("It is common knowledge that the consumption of alcohol and other drugs can impair the ability to safely operate a motor vehicle."). And Officer McDonald testified to several indicators that Caldwell was under the influence:

> From the time I made personal and physical contact with Mr. Caldwell all the way until the end, there was, as I have mentioned before, a very obvious odor of consumed alcoholic beverage coming from his person. I could smell it outside, and then the odor was more condensed and obvious once he was placed within my vehicle, to which I then noticed the bloodshot, watery eyes. You add that to his wide range of behaviors all the way from the hostility at the beginning to the crying to the joking around to the point when asked to simply sign a sheet saying he refused to do something he refused that as well. His emotions were all over the board compared to what—you know, what we can see today where he's very calm in his demeanor. So from my observations combined with my training and experience along with his admissions and statements, I believed him to be under the influence of alcohol while operating his vehicle.

*See State v. Blake*, No. 15-1771, 2016 WL 4384253, at *2 (Iowa Ct. App. Aug. 17, 2016) ("The court may also consider an officer's opinion regarding another person's sobriety.").

Viewing all of the evidence in the light most favorable to the State, we find sufficient evidence to support Caldwell's conviction.

**III. Motion to Suppress**

We turn next to Caldwell's suppression issues. Caldwell sought to suppress evidence of his refusal of certain SFSTs as well as his refusal to provide a breath sample on the DataMaster. Caldwell claims suppression was required because (1) police violated his statutory rights under section 804.20 and (2) the requirements of section 321J.6 were not met and, therefore, he was not "deemed

to have given consent to the withdrawal of" a breath sample. We address each statute in turn. We must affirm if the district court "correctly applied the law and there is substantial evidence to support the court's fact-finding." *State v. Lyon*, 862 N.W.2d 391, 394 (Iowa 2015); *see also State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019) ("We review a district court's interpretation of Iowa Code section 804.20 for errors at law." (citation omitted)).

**A. Iowa Code section 804.20**

Section 804.20 states in relevant part:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney.

Here it is undisputed Caldwell invoked section 804.20 by requesting to call his mother.[6] Still, our analysis of section 804.20 may require up to four different inquiries. First, to determine whether section 804.20 applies, we must make two distinct determinations: (1) whether Caldwell had been "arrested or otherwise restrained of his liberty" and (2) whether he was at the "place of detention." *See Davis*, 922 N.W.2d at 331. If those prerequisites are satisfied, we must ask (3) whether police violated section 804.20 by causing "unnecessary delay" before honoring Caldwell's request to make a phone call. *See id.* at 332. If we determine

---

[6] In other cases, the invocation issue is less clear. In those cases, invocation of rights under section 804.20 should be "liberally construe[d]" while also "balancing the rights of the arrestee and the goals of the chemical-testing statute." *See Davis*, 922 N.W.2d at 331 (alteration in original) (citation omitted).

police violated section 804.20, we must then determine (4) what remedy is appropriate.

*1. Restraint*

The restraint issue is effectively undisputed. The State appears to concede Caldwell was arrested or otherwise "restrained of his liberty" when he asked to call his mother. *See State v. Moorehead*, 699 N.W.2d 667, 671 (Iowa 2005). Officer McDonald testified that when they arrived at the jail, Caldwell "was under arrest for interference with official acts." Our first inquiry is satisfied.

*2. Place of detention*

This next issue is hotly disputed. The question is whether Caldwell was at "the place of detention" when he was asked to perform SFSTs in a marked hallway inside the jail. *See Davis*, 922 N.W.2d at 331. The district court found:

> It is clear from *Davis* that if SFSTs had been conducted in the field, a request for a phone call at that time would have been premature. Similarly, a request made during the performance of SFSTs in the sally port would have been premature. In *Davis*, "[f]unctionally, [the sally port] was the field for the 'field' sobriety tests." *Id.* at 332. . . . In a case such as this one, where there are substantial reasons to not perform SFSTs either in the field or in the sally port, the short entry into the rest of the jail is really a distinction without a difference. In such a case, the hallway near the booking area has become the "field." Since Officer McDonald was still in the investigative phase of the charge of [o]perating [w]hile [i]ntoxicated and, under the circumstances, the best place to complete the investigation was in that area of the jail, [Caldwell] had not truly arrived at the place of detention.

*See id.* at 332. The State echoes this view, arguing Caldwell was not at the place of detention because Officer McDonald was performing SFSTs at the time of invocation.

In *Davis*, a deputy transported a driver suspected of OWI to the jail's sally port to conduct SFSTs because of a snowstorm. *Id.* at 328. While in the deputy's squad car, Davis asked to speak to his wife. *Id.* The deputy told Davis he could talk to his wife after they were done. *Id.* After conducting the SFSTs in the jail's sally port and placing Davis under arrest for OWI, the deputy allowed him to call his wife and attorney inside the jail's intake room. *Id.* at 329. The court held the deputy did not violate Davis's section 804.20 rights "because the sally port was a location for testing, not a 'place of detention.'" *Id.* at 328. The court suggested the jail's sally port was not a place of detention because "Davis was there for purposes of field testing, not to be detained." *Id.* at 331.

Caldwell distinguishes *Davis* by noting that, when he requested a phone call, he was already (1) under arrest for interference with official acts and (2) inside the jail itself. *See id.* at 327. The officer had brought Caldwell inside the jail for OWI field testing and booking on the interference charge. Unlike in *Davis*, there was no indication that Caldwell would be free to go if he took the SFSTs and passed. *See id.* at 328–29. Also, the *Davis* court noted that "Iowa Code section 804.20 uses the term 'place of detention' interchangeably with 'the jail or other place of custody.'" *Id.* at 331. It is hard to say a defendant is not at a "place of detention" when a defendant who is under arrest has been brought *inside* a jail for purposes of detention. *See id.* Also, the State does not cite, and we cannot find, any cases that hold the inside of a jail is not a place of detention simply because SFSTs are being performed. We do not think *Davis* supports that conclusion. *See id.* So we find that section 804.20 applies.

*3. Unnecessary delay*

Because section 804.20 applies, we must next consider whether Caldwell's request to call his mother was honored "without unnecessary delay."[7]  *See* Iowa Code § 804.20.  For three reasons, we think the district court was right to conclude police did not violate Caldwell's rights under section 804.20.

First, the "delay" was very short.  *See id.*  Caldwell was allowed to make phone calls only five to six minutes after he asked to call his mother.  This court has declined to find "unnecessary delay" in cases involving similar timeframes. *State v. Smith*, No. 16-0749, 2017 WL 510957, at *2 (Iowa Ct. App. Feb. 8, 2017) (holding that "the some eleven minutes between the time Smith arrived at the police station and the time he was allowed to make phone calls did not constitute unnecessary delay"); *see also State v. Perry*, No. 11-1051, 2012 WL 1864568, at *3 (Iowa Ct. App. May 23, 2012) (holding that there was no unnecessary delay where "Perry was given the opportunity to contact an attorney approximately seven minutes after arriving in the booking room").

Second, this is not a case in which a suspect's phone calls were delayed because of police misconduct or even sloth.  During the five to six minute period

---

[7] In addition to his claims of "unnecessary delay," Caldwell argues that Officer McDonald "explicitly refused [Caldwell's] request for a phone call, saying 'Well you ain't getting a phone call right now.'"  This explicit refusal, Caldwell contends, instantly violated his statutory rights in a way that could not be cured by later offers by police to use the telephone.  We disagree.  It is true officers may not categorically deny a person's rights under section 804.20.  *See State v. Hicks*, 791 N.W.2d 89, 94 (Iowa 2010) (noting that a "peace officer cannot deny the right exists"); *Moorehead*, 699 N.W.2d at 671 (noting that "[a]n officer may not . . . tell a defendant he does not have such a right").  But Officer McDonald only told Caldwell he could not use the phone "right now."  Soon after, Officer McDonald led Caldwell to a phone and invited him to use it.  Neither the officer's words nor his actions amounted to a categorical denial of Caldwell's right to make calls.

at issue, Officer McDonald (1) completed his offer of SFSTs to Caldwell; (2) placed Caldwell back in handcuffs, (3) read the implied consent advisory to Caldwell, and (4) led Caldwell to the DataMaster room where the phone was located. These were all appropriate police activities. *See Smith*, 2017 WL 510957, at *2 ("Necessary security measures and administrative tasks first must be performed."). And as the district court observed, they would have taken less time if Caldwell had cooperated. They did not cause "unnecessary delay." *See State v. Colocho*, No. 18-1643, 2019 WL 5791011, at *4 (Iowa Ct. App. Nov. 6, 2019) (finding no violation of the defendant's section 804.20 rights where he was denied a phone call in the middle of SFSTs but later allowed the opportunity to make phone calls prior to conducting chemical testing); *see also Perry*, 2012 WL 1864568, at *3 (holding the reading of an implied consent advisory was not an "unnecessary delay").

Finally, we heed our supreme court's teaching that section 804.20 only confers "a limited statutory right to counsel before making the important decision to take or refuse a chemical test under implied consent procedures." *Davis*, 922 N.W.2d at 330–31, 334 (citation omitted) (concluding we must balance arrestees' rights with the goals of the chemical-testing statutes). This right was afforded to Caldwell. Although he chose to call his parents and employer instead of calling an attorney, Caldwell was given *the opportunity* to call an attorney—*in addition to* calling his parents and employer—before Officer McDonald requested a sample of Caldwell's breath.

For all of these reasons, we conclude police did not violate Caldwell's rights under section 804.20. So we need not reach the question of remedies.[8]

**B. Iowa Code section 321J.6**

Caldwell also claims that, because police lacked authority to invoke statutory implied-consent procedures, the district court should have suppressed his refusal to provide a breath sample. We agree.

Section 321J.2 makes it a crime to "operate[] a motor vehicle in this state" while "under the influence of an alcoholic beverage" or while "having an alcohol concentration of .08 or more." Section 321J.6 is Iowa's "implied consent" statute. It gives police "authority . . . to test the breath, blood or urine of any person suspected of driving while intoxicated." *State v. Overbay*, 810 N.W.2d 871, 875 (Iowa 2012). "The premise of [section 321J.6] is that a driver 'impliedly agrees to submit to a test in return for the privilege of using the public highways.'" *Id.* (quoting *State v. Hitchens*, 294 N.W.2d 686, 687 (Iowa 1980)); *see* Iowa Code § 321J.6(1) ("A person who operates a motor vehicle in this state under circumstances which give reasonable grounds to believe that the person has been operating a motor

---

[8] The text of section 804.20 does not describe a private remedy. It only provides: "A violation of this section shall constitute a simple misdemeanor." And so, in *State v. Heisdorffer*, the supreme court declined to hold that violation of section 804.20 required exclusion of evidence. 164 N.W.2d 173, 177 (Iowa 1969), *abrogated by State v. Vietor*, 261 N.W.2d 828 (Iowa 1978) ("The statute provides that its violation is a misdemeanor. The individual's rights are protected under the Fifth Amendment as interpreted by *Miranda*. We do not believe the statute extends defendant's rights to exclude the evidence beyond the constitutional requirements."). But then, in *Vietor*, the supreme court abrogated *Heisdorffer* and held that violation of the statute would require exclusion of a suspect's "refusal to submit to a chemical test." 261 N.W.2d at 832. Later cases extended the exclusion remedy to "breath tests, breath test refusals, and non-spontaneous statements." *Smith*, 2017 WL 510957, at *1 (citing *Hicks*, 791 N.W.2d at 97).

vehicle in violation of section 321J.2 or 321J.2A is deemed to have given consent to the withdrawal of specimens.").

But although "drivers are deemed to have impliedly consented to testing, they nonetheless generally have the statutory right to withdraw that consent and refuse to take any test." *Overbay*, 810 N.W.2d at 876 ("If a person refuses to submit to the chemical testing, a test shall not be given . . . ." (quoting Iowa Code § 321J.9(1))). Yet refusal can have serious consequences. If implied-consent is properly invoked and the driver still refuses to submit, the Iowa Department of Transportation must ("shall") revoke their driver's license for at least a year. Iowa Code § 321J.9(1). Moreover, if the driver is ultimately charged with driving while intoxicated, proof of refusing the chemical test "is admissible" at trial. Iowa Code § 321J.16. That happened in this case. Indeed, at Caldwell's trial, the district court instructed the jury that:

> The defendant was asked to give a breath sample so it could be analyzed to determine the percent of alcohol in his blood. The defendant refused.
> A person is not required to give a sample of any bodily substance; however, you may consider a refusal in reaching your verdict.

As Caldwell points out, though, a driver's refusal to provide a breath sample should only be admitted if the statutory requirements "were properly fulfilled before the [driver] refused." *State v. Seils*, No. 18-0481, 2019 WL 2144633, at *3 (Iowa Ct. App. May 15, 2019). Those requirements appear in section 321J.6. It provides in relevant part:

> The withdrawal of the body substances and the test or tests shall be administered at the written request of a peace officer having

reasonable grounds to believe that the person was operating a motor vehicle in violation of section 321J.2 or 321J.2A, *and if any of the following conditions exist*:

a. A peace officer has lawfully placed the person under arrest for violation of section 321J.2.

b. The person has been involved in a motor vehicle accident or collision resulting in personal injury or death.

c. The person has refused to take a preliminary breath screening test provided by this chapter.

d. The preliminary breath screening test was administered and it indicated an alcohol concentration equal to or in excess of the level prohibited by section 321J.2.

e. The preliminary breath screening test was administered to a person operating a commercial motor vehicle as defined in section 321.1 and it indicated an alcohol concentration of 0.04 or more.

f. The preliminary breath screening test was administered and it indicated an alcohol concentration less than the level prohibited by section 321J.2, and the peace officer has reasonable grounds to believe that the person was under the influence of a controlled substance, a drug other than alcohol, or a combination of alcohol and another drug.

g. The preliminary breath screening test was administered and it indicated an alcohol concentration of .02 or more but less than .08 and the person is under the age of twenty-one.

Iowa Code § 321J.6(1) (emphasis added).

As the words of section 321J.6 make clear, the police cannot subject a driver to the implied-consent dilemma (either provide a sample or else incur consequences) unless two statutorily-defined requirements have been met. First, the officer must have "reasonable grounds to believe that the person was operating a motor vehicle in violation of section 321J.2," that is, operating while intoxicated. *Id.* Second, one or more of the seven "conditions" described in paragraphs 321J.6(1)(a) through (f), respectively, must "exist." *Id.*

In this case, the parties do not dispute that Officer McDonald had "reasonable grounds to believe" Caldwell was operating while intoxicated. *See id.* And the parties agree that six of the seven "conditions" did not "exist." *Id.*

Specifically, they agree the conditions described in paragraphs (b) through (f) did not exist.

But the parties disagree about paragraph (a). It is fulfilled when "[a] peace officer has lawfully placed the person under arrest for violation of section 321J.2." *Id.* § 321J.6(1)(a). The district court found, and the State argues, this condition existed because Officer McDonald had "lawfully placed" Caldwell "under arrest for violation of section 321J.2" when Officer McDonald invoked implied consent. *Id.*

Caldwell disagrees. Caldwell does not dispute that, before he even reached the jail, Officer McDonald had arrested him. But, as Caldwell points out, paragraph 321J.6(1)(a) expressly requires the driver to be "under arrest *for violation of section 321J.2*," that is, operating while intoxicated. Just any arrest is not enough. And, in Caldwell's view, he was *only* under arrest for interference. He was *not* under arrest *for driving while intoxicated* before Officer McDonald invoked implied consent. *See id.* Therefore, Caldwell argues, Officer McDonald was not authorized to invoke implied consent. And so Caldwell's refusal to submit to the chemical test should not have been admitted.

To resolve the parties' competing claims, we must answer questions of statutory interpretation,[9] namely, when has "[a] peace officer . . . lawfully placed the person under arrest *for violation of section 321J.2*?" *See id.* What, exactly, must happen for this "condition" to occur?

---

[9] "We review the district court's decision to deny a motion to suppress based on interpretation of a statute for correction of errors at law." *State v. Madison*, 785 N.W.2d 706, 707–08 (Iowa 2010).

We look for answers in "the language of" chapter 321J. *Bearinger v. Iowa Dep't of Transp.*, 844 N.W.2d 104, 108 (Iowa 2014). We are bound by "the plain meaning" of its words. *Seils*, 2019 WL 2144633, at *4 ("The plain meaning of chapter 321J requires us to determine Seils's refusal to comply with chemical testing was not admissible evidence where Trooper Flaherty failed to meet the statutory conditions precedent before invoking implied consent."). "We will not undermine the legislature's policy decision[s] by ignoring the plain language of the statute." *State v. Palmer*, 554 N.W.2d 859, 865 (Iowa 1996).

We use "traditional interpretive tools . . . to determine the ordinary and fair meaning of the statutory language at issue." *Matter of Est. of Franken*, 944 N.W.2d 853, 859 (Iowa 2020). Among other things, we "consider the context of the provision[s] at issue and strive to interpret [them] in a manner consistent with the statute as an integrated whole." *Bearinger*, 844 N.W.2d at 108 (citation omitted). And we avoid interpretations of "chapter 321J" that would "render[] any part of the enactment superfluous." *Id.* (citation omitted).

Another well-established principle holds that, when the legislature explicitly defines its words, courts are bound by those definitions. *See State v. Iowa Dist. Ct.*, 889 N.W.2d 467, 471 (Iowa 2017) ("It is a well-settled principle of statutory interpretation that '[w]hen the legislature has defined words in a statute—that is, when the legislature has opted to "act as its own lexicographer"—those definitions bind us.' As a corollary to this principle, when a statute defines a term, 'the common law and dictionary definitions which may not coincide with the legislative definition must yield to the language of the legislature.'" (alteration in original) (citations omitted)). Here the parties have drawn our attention to sections 804.5

and 804.14.[10]  *See Dennison*, 571 N.W.2d at 494 ("The definition of 'arrest' for purposes of [Iowa Rule of Criminal Procedure] 27(2)(a)[[11]] is governed by the general law of arrest provided in Iowa Code chapter 804, specifically Iowa Code sections 804.5 and 804.14."), *overruled by State v. Williams*, 895 N.W.2d 856 (Iowa 2017).[12]  In section 804.5, the legislature defined an "[a]rrest" as the "taking of a person into custody when and *in the manner authorized by law*, including restraint of the person or the person's submission to custody."  (Emphasis added.) And in section 804.14, the legislature prescribed the "[m]anner" for making arrests, stating:

> A person making an arrest **must inform the person** to be arrested of the intention to arrest the person, **the reason for arrest**, and that the person making the arrest is a peace officer, if such be the case, and require the person being arrested to submit to the person's

---

[10] We have not overlooked section 321J.1(3), in which the legislature provided a definition for "arrest" that applies throughout chapter 321J "unless the context otherwise requires."  It states: "'Arrest' includes but is not limited to taking into custody pursuant to section 232.19."  But section 232.19 only addresses situations involving a "child."  Because Caldwell is an adult, section 232.19 does not apply to him.

[11] Iowa Rule of Criminal Procedure 27(2)(a) was renumbered and is now Iowa Rule of Criminal Procedure 2.33(2)(a).

[12] The State cites section 804.14 and claims the evidence "sufficiently meets" its "requirements."  Caldwell cites *Dennison* which, as noted above, cites sections 804.5 and 804.14.  571 N.W.2d at 494.

For the sake of clarity, we add that *Dennison* was a speedy-indictment case. *See id.* at 493.  But the parties do not suggest—and we do not believe—that Iowa's speedy-indictment jurisprudence should govern our approach to this implied-consent case.  *See Williams*, 895 N.W.2d at 865 (holding that, for purposes of speedy indictment, the arrest process is not "complete" until the person is brought "before the magistrate" and "the person is no longer under the control of the arresting officer"); *see also State v. Miller*, 818 N.W.2d 267, 277 (Iowa Ct. App. 2012) (addressing facts similar to those at bar and applying the pre-*Williams* "reasonable person's perspective" test to determine "[t]he date of arrest for speedy indictment purposes").  Rather, we confine our inquiry to the narrow question of whether, for purposes of paragraph 321J.6(1)(a), Caldwell was "lawfully placed . . . under arrest for violation of section 321J.2" before Officer McDonald invoked implied consent.  *See* Iowa Code § 321J.6(1)(a).

custody, except when the person to be arrested is actually engaged in the commission of or attempt to commit an offense, or escapes, so that there is no time or opportunity to do so.

Iowa Code § 804.14(1) (emphasis added).

Based on these provisions, it appears that—before a "peace officer" can fulfill the requirements of paragraph 321J.6(1)(a) by "lawfully plac[ing a] person under arrest *for violation of section 321J.2*"—the officer "must inform the person" that "the reason for arrest" is "violation of section 321J.2." *See id.* §§ 321J.6(1)(a) (emphasis added), 804.14(1). And where, as here, the person is *already* under arrest for some *other* sort of violation, we agree with Caldwell that the officer needs to specifically "inform" the person that they are *also* arrested for *the additional* "reason" of violating section 321J.2.

We think this reading is consistent with our court's recent decision in *Seils*. *See generally* 2019 WL 2144633, *1–4. The Iowa State Patrol pulled Seils over on suspicion of drunk driving. *Id.* at *1. During the stop, Seils exhibited signs of impairment. *Id.* Before the stop was completed, though, Seils departed on foot. *Id.* He walked at first, but then he "broke into a run." *Id.* Troopers pursued. *Id.* After some effort, troopers "got him to the ground" and handcuffed him. *Id.* Seils then asked, perhaps ironically, "Are you seriously arresting me?" *Id.* A trooper assured Seils, "Yes, I am." *Id.* Seils was placed in a cruiser and told, "Now you're going for interference." *Id.*

At the local jail, a trooper invoked implied consent. *Id.* at *2. But Seils refused to provide a sample for testing. *Id.* The State charged Seils with OWI. *Id.*

Seils filed a motion to suppress. *Id.* He argued that "evidence of his refusal to submit to chemical testing should be suppressed because" the officer "failed to

meet any of the necessary conditions in section 321J.6 before invoking his implied consent." *Id.* And at the hearing, the trooper "conceded he never told Seils specifically that he was under arrest for OWI" before invoking implied consent. *Id.* at \*3. Still the district court denied Seils's motion. *Id.* And a jury convicted Seils of OWI. *Id.*

On appeal, Seils argued the officer "did not follow the necessary procedure" because Seils "was not placed under arrest for operating while intoxicated before the trooper invoked implied consent, *see* Iowa Code § 321J.6(1)(a), and it is undisputed none of the other conditions were met, *see id.* § 321J.6(1)(b)–(g)." *Selis*, 2019 WL 2144633, at \*3. Therefore, Seils argued, evidence of his refusal should have been suppressed. *Id.* This court agreed and reversed. *Id.* at \*5. We explained:

> At the suppression hearing, the trooper admitted *he told* Seils he was under arrest for OWI *only after* Seils refused to take the breath test. *See* Iowa Code § 321J.6(1)(a). In fact, [the trooper] told Seils that if he took the breath test and "passed," the trooper would only charge him with interference and would give Seils a ride home. We agree that under the facts of this case, the State failed to prove that [the trooper] had lawfully placed Seils under arrest for a violation of section 321J.2 *at the time* he invoked implied consent. Thus, the foundation requirements for implied consent had not been met *when* Seils refused the test. . . . The plain meaning of chapter 321J requires us to determine Seils's refusal to comply with chemical testing was not admissible evidence where [the trooper] failed to meet the statutory conditions precedent *before* invoking implied consent.

*Id.* at \*3–4 (emphasis added).

One key lesson of *Seils*, we think, is that the "foundation[al] requirements for implied consent" were not fulfilled because the trooper failed to tell Seils he was under arrest for OWI "before" invoking implied consent. *Id.* at \*3. This lines up

with our statutory analysis which, as explained above, suggests that the requirements of paragraph 321J.6(1)(a) are not fulfilled unless a peace officer has "inform[ed]" the suspect that they have been arrested for "violation of section 321J.2." Iowa Code §§ 321J.6(1)(a), 804.14(1).

Here it appears undisputed that, although Officer McDonald told Caldwell he was under arrest *for interference*, Officer McDonald did not inform Caldwell he was *also* under arrest for driving while intoxicated *before* invoking implied consent. Under *Seils*, as well as our analysis of the statutes, Officer McDonald had not "lawfully placed" Caldwell "under arrest *for violation of section 321J.2*" before Officer McDonald invoked implied consent. *See id.* § 321J.6(1)(a) (emphasis added); *Seils*, 2019 WL 2144633, at *4. Therefore, as in *Seils*, we conclude "[t]he plain meaning of chapter 321J requires us to determine" that Caldwell's "refusal to comply with chemical testing was not admissible evidence" because Officer McDonald "failed to meet the statutory conditions precedent *before* invoking implied consent." *See Seils*, 2019 WL 2144633, at *4 (emphasis added).

The State responds that it is only "required to substantially, rather than strictly, comply with the procedural requirements of Iowa Code section 321J.6." *See Palmer*, 554 N.W.2d at 867 (noting our courts have overlooked procedural shortcomings that were "merely technical in the sense [that] noncompliance did not jeopardize any of the purposes underlying the implied consent procedures"). And we have considered all of the circumstances that the State believes add up to substantial compliance. The State emphasizes that (1) at the jail, Officer McDonald removed Caldwell's handcuffs; (2) Officer McDonald then explained to Caldwell that, because Officer McDonald believed Caldwell was "driving" and

"under the influence of alcohol,"[13] Officer McDonald was "going to offer" Caldwell SFSTs; (3) Officer McDonald offered—and Caldwell refused—three SFSTs; and then (4) Officer McDonald placed handcuffs back on Caldwell before leading him to the DataMaster room. Taken together, the State claims, this "evidence sufficiently meets the requirements of Iowa Code section 804.14" and, therefore, shows "substantial[] compli[ance] with section 321J.6 prior to the invocation of implied consent."

We disagree. As explained, when we read section 804.14 and paragraph 321J.6(1)(a) together, we conclude the requirements of section 321J.6 could not have been fulfilled unless Officer McDonald "inform[ed]" Caldwell that he had been arrested for "violation of section 321J.2" before Officer McDonald invoked implied-consent. Officer McDonald did not do so, either through his words or through his deeds. Indeed, as the State concedes, Officer McDonald did not even *believe* Caldwell was under arrest for OWI when he invoked implied consent. Instead, as Officer McDonald testified, Caldwell was "under arrest for" interference while Officer McDonald continued "investigating" the OWI issue.[14]

---

[13] Officer McDonald told Caldwell the facts that supported his belief, namely, (1) he could smell alcohol; (2) Caldwell's eyes were watery; and (3) Caldwell's "intoxilizer was making noise."

[14] The State notes: "The officer's interpretation of what constitutes an arrest is irrelevant as this [c]ourt can rely on its own interpretation." We agree that the officer's subjective beliefs are not dispositive. But when an officer does not believe a person is under arrest for X offense, it seems especially unlikely the officer would "inform" the person they are under arrest for X offense as required by the statute. *Cf.* Iowa Code § 804.14(1) ("A person making an arrest *must inform the person* to be arrested of . . . *the reason for arrest* . . . ." (emphasis added)).

**IV. Conclusion**

Sufficient evidence supports Caldwell's conviction. And we conclude his rights under section 804.20 were not violated. Even so, we conclude the court should have suppressed Caldwell's refusal to provide a breath sample. So we reverse and remand for a new trial. In light of this disposition, we do not reach Caldwell's other arguments.

**REVERSED AND REMANDED.**