NOT DESIGNATED FOR PUBLICATION

No. 128,476

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

TYLER ELI JOHNSON,
*Appellee*.


MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD R. KUCKELMAN, judge. Submitted without oral argument. Opinion filed November 7, 2025. Affirmed.

*Andrew J. Lohmann,* assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellant.

*Gregory C. Robinson,* of Lansing, for appellee.


Before ARNOLD-BURGER, P.J., HURST, J., and JACOB PETERSON, District Judge, assigned.


PER CURIAM: Like so many cases on appeal, this one stems from a tragedy. While attempting to pass a car during his morning commute, Tyler Eli Johnson struck and killed a motorcyclist. Although none of the officers on the scene believed Johnson was impaired, as part of the accident investigation, officers encouraged Johnson to consent to a blood draw for the purpose of checking his blood alcohol level (BAC). Johnson ultimately consented to the blood draw, which showed that he had a BAC high enough to support charges related to driving under the influence (DUI). The State charged Johnson with several serious crimes related to the crash, and Johnson thereafter sought to suppress

1

evidence from the blood draw, claiming it was an unreasonable search in violation of the Fourth Amendment. The district court agreed and suppressed the evidence, hindering the State's ability to prosecute more than one of the charges against Johnson. The State appeals.

Although Johnson submitted to the blood draw, the State has failed to show that the submission was voluntarily given and free from undue coercion. At the collision scene, officers made the blood draw seem customary and helpful for Johnson's own defense and explained that him giving consent would be "easier" and that they would provide him additional information about his consent at the hospital. Once at the hospital, the officer inaccurately told Johnson that his refusal to submit blood testing would result in the automatic loss of his license for one year and that he was permitted to consult an attorney after submission. Johnson was never told that he could refuse to consent to the blood draw without facing automatic consequences.

Under the totality of these circumstances, the State has failed to show that Johnson's consent was freely given. The district court did not err in granting Johnson's motion to suppress evidence from the blood draw, and this court affirms its decision.

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of October 23, 2023, Tyler Eli Johnson struck an oncoming motorcyclist in a head-on collision. Relevant portions of the investigation were captured on police officers' body and vehicle cameras. After Johnson was cleared by medical personnel, investigating officer Sergeant Brandon Mance asked Johnson about the timeline of events in an attempt to identify circumstances contributing to the crash. Sergeant Mance noted that Johnson showed no signs of intoxication and testified at the suppression hearing that Johnson's "balance was okay" and that his "speech pattern was fine, there wasn't over obvious slurred speech, there wasn't rambling or issues with

2

focus." Officer Sarah Howard, who had arrived at the scene just before Sergeant Mance, also observed no signs of intoxication in Johnson. Both Sergeant Mance and Officer Howard noted that Johnson seemed rattled by the crash.

Sergeant Mance discussed the nature of the collision with Johnson and said, "what we tend to do . . . is see if the person who is involved . . . would submit to any of the preliminary breath tests . . . to rule out any type of intoxicants." He then asked Johnson if he had consumed alcohol prior to the accident. During the conversation with Sergeant Mance, Johnson disclosed that he had consumed a drink of Sailor's Jerry Rum at 11 p.m. the previous night. They discussed Johnson's activities the night before including his food intake, amount of sleep, and Johnson's destination on the morning of the accident. Johnson denied using any narcotics.

Because he observed no indication that Johnson was under the influence of alcohol, Sergeant Mance determined that any blood test would need to be done with Johnson's consent. Later in the same conversation, Sergeant Mance told Johnson that he would receive forms related to his consent to the search:

> "Officer Howard . . . the officer you already spoke to previously   . . . I'm going to talk to her about . . . what we tend to do on these is with your permission is she'll have some forms for you to fill out and some stuff to read to you . . . that reference your consent to provide a blood draw. We're just going to go that route because it's easier. If you're cool with that?"

In response to Sergeant Mance's statement, Johnson can be seen nodding affirmatively in the body camera footage.

At some point, Johnson's mother arrived on scene, and Sergeant Mance spoke to Johnson and his mother together explaining the reasons for requesting Johnson take a blood draw test for intoxicants:

3

"I was talking to Tyler and the way I explained to him on situations where . . . we plan for the worst, hope for the best. The motorcycle rider is in critical condition. He did get transported to the hospital. I don't want that person to pass, but in the same token of things I also want to protect that person's interests as well as Tyler's interests. I don't want later on down the line for somebody to come along and say, 'Well, Tyler's supposed to have an interlock device, I bet he was drinking.' This blood test comes back, shows that there's not enough intoxicants or intoxicants at all in his system to be considered an intoxicated driver? That's protection for him. . . . But, again, on the other flip of the coin, if it does come back that—hey, Tyler's not—was not able to safely operate a motor vehicle—I mean, I'm not seeing that as far as the physical outputs of it. . . . I'm much more the better safe than sorry."

Sergeant Mance then said that Officer Howard would have "some paperwork . . . that she's got to read to him by law, and so he can make an informed decision as to whether or not he wants to go through with this." Sergeant Mance then told Johnson's mother that "after everything's all said and done, he's gonna get to ride home with you."

Afterward, Sergeant Mance told Officer Howard that if they went "through all the process and we read through all the DC-70 information," Johnson was willing to do a blood draw. Before leaving the scene, Officer Howard asked Johnson, "And you said that you wanted to go through with the blood draw?" Johnson's response is difficult to hear on the body camera footage. However, it appears Johnson indicated agreement because Johnson then rode to the hospital with his mother. Officer Howard drove separately and followed them to the hospital.

At the hospital, Officer Howard handed Johnson a copy of the DC-70 notice that Sergeant Mance had referenced earlier and read the following four testing notices out loud to him:

4

"1. If you refuse to submit to and complete the test or tests, your driving privileges will be suspended for a period of one year.

"2. If you fail a test, your driving privileges will be suspended for a period of either 30 days or one year.

"3. The results of the testing may be used against you at any trial or hearing on a charge arising out of the operation or attempted operation of a vehicle while under the influence of alcohol or drugs, or both.

"4. After the completion of the testing, you may request and have the right to consult with an attorney and may secure additional testing."

After reading the notices, Officer Howard told Johnson the rest of the form did not apply to him. Johnson then agreed to take the blood test and signed the form.

Testing showed Johnson's BAC was .08 within three hours of the crash. In January 2024, the State charged Johnson with felony involuntary manslaughter while driving under the influence, felony DUI—fourth or subsequent offense, misdemeanor circumvention of an ignition interlock device, and two traffic infractions. On July 15, 2024, the State filed notice of its intent to use the results of the blood test at trial.

On October 21, 2024, Johnson moved to suppress the results of the blood draw, claiming that law enforcement's coercive and misleading statements rendered his consent involuntary. Johnson argued that although he first agreed to the blood draw, any consent was rendered involuntary when an officer read him an inapplicable DC-70 notice, which incorrectly informed him that his driving privileges would be suspended for one year if he refused to submit to and complete the test. In its motion in opposition, the State conceded that although law enforcement officers did not have probable cause to believe that Johnson was operating a vehicle while under the influence—meaning that the implied consent law in K.S.A. 8-1001 was inapplicable—Johnson validly consented to

the blood draw. The State also argued that officers' reasonable, good-faith belief that they needed to read the DC-70 notices should save the search from exclusion.

At the hearing on the motion to suppress, the officers testified and the State presented audio and video records from the officer's body cameras. Officer Howard was asked whether the DC-70 notice was used for DUI investigation purposes. She responded, "We read it for everybody that we get a blood draw from." When asked whether it was a part of her training and experience that the form was only read for DUI investigations, Officer Howard responded, "It's for blood draws." She further testified that she would not have filled out a DC-27 form concerning hearing notices and revocation of privileges because they did not have reasonable suspicion Johnson was illegally driving under the influence. Officer Howard also testified that if Johnson had refused to perform the blood draw at the hospital, she would have asked Sergeant Mance for the next steps.

The district court found that there was no probable cause to support a blood test and thus the DC-70 notice should not have been given. The district court found that although Johnson agreed to the blood test, that consent was only given after Sergeant Mance told him that the test was routine. Moreover, the court noted that officers never told him of the "right to decline the test," which "implied that [Johnson] was required to take the test." The district court stated that the "problem was compounded by the fact that Officer Howard then told [Johnson] he could lose his driving privileges for one year if he did not take the test." The court explained, "Even if [Johnson] gave valid consent at the scene, he still had the right to later withdraw his consent. The threat of taking [Johnson's] driving privileges was coercive."

The court concluded that "[w]hen considering the totality of the facts, the Court concludes that the evidence from the blood test in this matter should be suppressed." Finally, the district court denied application of any good-faith exception, explaining that

6

"[a]lthough the officer's mistake may have been innocent, it was unreasonable and infringed on [Johnson's] rights." The district court then granted Johnson's motion to suppress.

The State timely filed an interlocutory appeal.

## DISCUSSION

The State appeals the district court's suppression of Johnson's blood draw results by arguing: (1) Johnson voluntarily, intelligently, and knowingly consented to the blood draw before receiving any inaccurate notices; (2) the officers acted reasonably by reading Johnson the DC-70 notices; and (3) even if Johnson's consent was involuntary and the blood draw violated his Fourth Amendment rights, the exclusionary rule should not be applied. Neither party disputes this court's jurisdiction to hear the State's interlocutory appeal under K.S.A. 22-3603. See *State v. Myers*, 314 Kan. 360, 365, 499 P.3d 1111 (2021). This statute permits "appellate review of trial court rulings on pretrial motions *which may be determinative of the case*." *State v. Newman*, 235 Kan. 29, 35, 680 P.2d 257 (1984).

The Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution both prohibit the government from engaging in unreasonable searches and seizures. Blood tests conducted by the police constitute searches that are subject to these requirements. See *Birchfield v. North Dakota*, 579 U.S. 438, 455, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016); *State v. McDonald¸* 318 Kan. 486, 487, 544 P.3d 156 (2024); *State v. Ryce*, 306 Kan. 682, 684, 396 P.3d 711 (2017). A warrantless search is per se unreasonable unless it falls within one of the exceptions to the warrant requirement. *State v. Crudo*, 318 Kan. 32, 35, 541 P.3d 67 (2024). The State has the burden to prove a search or seizure was legal. *McDonald¸* 318 Kan. at 487.

7

This court reviews a district court's decision on a motion to suppress in two steps. *State v. Goodro*, 315 Kan. 235, 238, 506 P.3d 918 (2022). First, the appellate court determines whether the district court's factual findings are supported by substantial competent evidence, which is legal and relevant evidence that a reasonable person would find sufficient to support a conclusion. 315 Kan. at 238. Second, the appellate court examines the district court's ultimate legal conclusions de novo without reweighing evidence, assessing the credibility of witnesses, or resolving conflicts in the evidence. 315 Kan. at 238. Where, as here, the significant facts are not in dispute, whether to grant or deny a suppression motion presents a question of law over which an appellate court has unlimited review. *State v. Guein*, 309 Kan. 1245, 1252, 444 P.3d 340 (2019).

## I.   CONSENT TO SEARCH

The State argues that Johnson's blood draw did not constitute an unreasonable search or seizure because Johnson validly consented to the blood draw. A defendant's implied or express consent can constitute an exception permitting the government's warrantless search. See *City of Kingman v. Ary*, 312 Kan. 408, 410-11, 475 P.3d 1240 (2020) (discussing consent exception). The State relies on the consent exception and therefore must prove by a preponderance of the evidence that Johnson's consent to the blood draw was valid. See *State v. Daino*, 312 Kan. 390, 397, 475 P.3d 354 (2020). "Valid consent to a search requires both (1) clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the absence of duress or coercion." *State v. James*, 301 Kan. 898, Syl. ¶ 4, 349 P.3d 457 (2015). This court reviews the totality of the circumstances to determine whether consent to a search was voluntarily given free from coercion. *Daino*, 312 Kan. at 397.

In evaluating voluntariness of a consent to search, this court must determine whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter. See *Florida v. Bostick,* 501 U.S. 429, 436, 111 S. Ct. 2382, 115

8

L. Ed. 2d 389 (1991) ("'Consent' that is the product of official intimidation or harassment is not consent at all."). Consent may not be coerced, either explicitly or implicitly. *Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). A defendant's knowledge of the right to refuse to consent is one factor to be considered regarding the totality of the circumstances. *State v. Nece*, 303 Kan. 888, 892-93, 367 P.3d 1260 (2016).

Importantly, Kansas has an implied consent statutory scheme that provides a mechanism for law enforcement to obtain consent to search a driver's bodily fluid during a DUI investigation. See *Nece*, 303 Kan. at 892 (explaining the application of Kansas' implied consent statute). Under the statute, "[a]ny person who operates or attempts to operate a vehicle within this state may be requested . . . to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs." K.S.A. 8-1001(a). However, such a test can only be *required* when "a law enforcement officer has probable cause to believe the person" is operating the vehicle under the influence of intoxicating substances and the person has been arrested or has been involved in a motor vehicle accident or collision resulting in damage or injury. K.S.A. 8-1001(b)(1). In those limited situations, the suspect is subject to consequences for failure to submit to the search and thus "shall be given oral and written notice" that, among other things, the refusal to submit to the test will result in "the person's driving privileges [being] suspended for a period of one year." K.S.A. 8-1001(d). This statute relies on the consent exception to the Fourth Amendment under the theory that drivers impliedly consent to bodily searches for intoxicants under certain, specific circumstances. See *City of Kingman*, 312 Kan. at 411-12.

The parties do not dispute that the implied consent statute requiring the DC-70 notices is inapplicable here because officers did not have probable cause to believe Johnson was driving under the influence. The facts relevant to the voluntariness of Johnson's consent are undisputed and therefore this court's review is a question of law as

9

to whether those undisputed facts demonstrate Johnson's consent was freely and voluntarily given. See *Nece*, 303 Kan. at 894 ("[A]n appellate court will review de novo the 'ultimate legal conclusion regarding the suppression of evidence.'"). As relevant background, Johnson has experience with DUI investigations, having been previously charged and convicted of DUI.

The factual circumstances related to the present issue are:

- Johnson was in a vehicle collision causing serious injury to another;
- Investigating officers did not have probable cause to believe Johnson was driving under the influence of intoxicating substances;
- Investigating officers implied to Johnson that submission to a blood test in these situations was customary;
- Investigating officers told Johnson the blood test could help him under the circumstances—specifically, that it could help address any possible assumptions based on him not having his interlock device installed;
- At the scene, officers told Johnson he would receive written information at the hospital about his consent to the blood draw;
- Johnson nodded in agreement in response to the officer asking if he was "cool with that" in reference to the blood draw;
- At the scene, the investigating officer told Johnson and his mother that another officer would have information at the hospital so Johnson could make an "informed decision" about agreeing to the blood draw;
- At the hospital, an officer read Johnson the DC-70 notices and provided them in writing for Johnson to review, which included the notification that Johnson's refusal to submit to the blood draw would cause him to lose his license for one year;

10

- No one told Johnson that he could decline to consent to the blood draw without legal consequence; and
- Johnson submitted to the blood draw.

The State argues that Johnson's experience with law enforcement and his consent before receiving the DC-70 notices weigh in favor of finding his ultimate consent voluntary. The State also argues that the *defendant* must show that the coercive conduct impacted their decision to consent. Therefore, the State contends, Johnson must show a connection between the DC-70 notice of inaccurate legal consequences for failure to consent and his ultimate consent to the blood test. Although the State cites several non-Kansas cases to support this legal argument, none of them are helpful to its position. See, e.g., *Luna-Galacia v. State*, 369 Ga. App. 142, 892 S.E.2d 50 (2023); *Morehouse v. Commissioner of Public Safety*, 911 N.W.2d 503 (Minn. 2018); *State v. Overbay*, 810 N.W.2d 871 (Iowa 2012); *Sandoval v. State*, 17 S.W.3d 792 (Tex. App. 2000); *Texas Dept. of Public Safety v. Rolfe*, 986 S.W.2d 823 (Tex. App. 1999).

These cases are distinguishable. For example, in *Luna-Galacia*, the officer had probable cause to believe the defendant was driving under the influence and arrested him and then read him the implied consent warnings. However, the disputed notice is different than the one here. The officer read Luna-Galacia a notice that stated that refusal to take the breathalyzer could be used against him, and this notice was later determined illegal under Georgia's prohibition against self-incrimination. 369 Ga. App. at 143-45. The Georgia court viewed the totality of the circumstances—including the potential coercive effect of the inaccurate notice—and determined that under the totality the defendant's consent was voluntary. 369 Ga. App. at 147-49. Not only are the relevant facts distinguishable because the implied consent statute applied in the Georgia case, the potential coercion caused under those circumstances is different than here.

11

*Sandoval* also involved implied consent under the Texas statute—that is, the investigating officer had evidence of the driver's intoxication—and involved an alleged promise of leniency if the defendant passed the breathalyzer, not an inaccurate threat of legal consequences for a failure to consent to testing. 17 S.W.3d at 794. In *Morehouse*, the Minnesota Supreme Court reviewed an allegation of a due process violation related to a driver's license revocation—not an allegation of unreasonable search and seizure like in this case. 911 N.W.2d at 504. In *Overbay*, the Iowa implied consent statute applied because the officer had reasonable grounds to believe the defendant was operating a vehicle while intoxicated—the officer requested a blood draw test and notified Overbay that refusal would result in revocation of her driver's license. 810 N.W.2d at 879-80. In Iowa, the implied consent law does not require a blood test, so a defendant can refuse a blood draw and then the officer can request a urine or breath test—the driver's refusal of one of those options would then result in the driver's license revocation. Under the "record as a whole," the Iowa Supreme Court determined the State proved the consent was voluntary where a more accurate advisory—that a license revocation would only occur after refusal of a urine or breath test and not a blood test—was not given to the defendant. 810 N.W.2d at 877, 879-80. But again, these cases are so factually distinguishable from the circumstances in this case that the quotes cited by the State out of context are inapplicable.

Finally, in *Texas Dept. of Public Safety*, the officer allegedly gave an extra-statutory warning to a defendant exhibiting "several known indicators of intoxication" that neither party argued was legally inaccurate, but the defendant argued was coercive. 986 S.W.2d at 824-25. The Texas court indicated a need for a "causal link between the improper warning and the accused's agreement to submit to a breath test." 986 S.W.2d at 827. However, a more recent opinion clarified that the causal connection is only required "[i]f the extra-statutory warning is *not* related to the consequences of refusing a breath test." (Emphasis added.) *State v. Jones*, No. 03-01-00544-CR, 2002 WL 31118304, at *3 (Tex. App. 2002) (unpublished opinion). Additionally, and contrary to the State's reliance

12

on *Sandoval* and *Texas Dept. of Public Safety*, the Texas Criminal Court of Appeals has since clarified that when a defendant alleges evidence is the product of involuntary consent "in a motion to suppress, the State must prove voluntary consent by clear and convincing evidence." *Fienen v. State*, 390 S.W.3d 328, 335 (Tex. Crim. App. 2012). In distancing itself from prior decisions, the court continued:

> "Contrary to this notion, the courts of appeals have placed a burden on the defendant to show that he was coerced, specifically that there was a causal connection between the warning and his decision to submit to the test. This should not be so—once the defendant has raised the issue in his motion, the burden of proof is on the State, and it does not shift back to the defendant." *Fienen*, 390 S.W.3d at 335.

Likewise, here, in a motion to suppress, the State carries the burden to prove by a preponderance of the evidence that Johnson's consent was freely and voluntarily given. See *Daino,* 312 Kan. at 397; *Nece,* 303 Kan. at 893.

The State also argues that Johnson's consent could not be tainted by the DC-70 notices because he consented to the blood draw *before* receiving the notices. The State cites a case where a panel of the Pennsylvania Superior Court opined that if the defendant "validly consented *before* being informed that he faced enhanced criminal penalties for failure to do so, then his consent would not be tainted by the warning and the blood test results would be admissible." *Commonwealth v. Haines*, 168 A.3d 231, 236-37 (Pa. Super. 2017) (remanding for the district court determine at what point the defendant was given the partially inaccurate notices). First*, Haines* does not stand for the proposition that consent given before inaccurate notices is categorically valid consent, but rather, the court remanded for factual findings so the court could determine "whether, under the totality of the circumstances, including the issue of timing, Haines' consent to the blood draw was valid." 168 A.3d at 237. Second, the partially inaccurate notice at issue stated that Haines would face enhanced criminal penalties for refusal if he was later convicted of or plead guilty to DUI—a different type of potential coercion than here. Finally, in

13

*Haines* and other cases applying its analysis, the implied consent statute applied because officers had the requisite evidence to believe the defendant was illegally operating a vehicle under the influence of intoxicating substances, which is not present here. See, e.g., *Commonwealth v. Moser*, 188 A.3d 478 (Pa. Super. 2018). Once again, the dicta cited from the Pennsylvania court is not persuasive in this case.

Although this dalliance into the non-Kansas cases the State relies on is time consuming and arguably unnecessary given the clear, relevant precedent available, it demonstrates an important principle. Though a case might contain a phrase that standing alone appears helpful to an argument, the facts, procedural posture, and legal principles at issue within it limit the relevance of the statement to the case at hand. The cited cases are simply so distinguishable as to be wholly unsupportive of the State's contentions.

Having established that the State—not the defendant—carries the burden to show voluntariness, this court must review the totality of the circumstances to determine whether the State has demonstrated Johnson's consent was voluntary. *Nece*, 303 Kan. at 893. The State argues that Johnson's experience with the criminal justice system and his initial "consent" at the crash scene undermine the coercive nature of the inaccurate notice Johnson received. However, Johnson's prior DUI experience may have enhanced Johnson's misunderstanding of his right to refuse without consequence. For example, if Johnson's prior cases involved probable cause, then his experience could have invoked the implied consent statute, meaning a DC-70 notice would have correctly been read to him, and refusal to consent to a test would have resulted in loss of his license. Second, Jonson's initial "consent" to the blood test at the scene could always have been withdrawn without legal consequence and was, therefore, not final until the blood draw was conducted. This court cannot say that the consent given most temporally distant from the search should carry more weight than the consent given just before the search. Third, as part of Johnson's initial "consent" to the blood test at the scene, he was told that an officer would provide written information about his consent before submitting to the blood draw.

14

Therefore, contrary to the State's argument, Johnson never gave unequivocal consent to the blood draw. His "consent" was always conditioned on the promise that he would be given more information that was required by law so that he could make an "informed" decision about his consent.

There is no mechanical, mathematical approach to determining voluntariness of consent; rather this court must look at the totality of the circumstances to determine whether consent was freely given without impermissible coercion. In a strikingly similar case, a panel of this court found that a defendant's consent to a blood draw was coercive under the totality of the circumstances when the defendant received inaccurate notices about the consequences of refusal. *State v. Estrada*, No. 113,838, 2016 WL 2774321, at *7 (Kan. App. 2016) (unpublished opinion). As courts have consistently found, "falsely claiming authority to impose consequences for refusing to submit to testing can be coercive." *Nece*, 303 Kan. at 895-96. And while no single factor is "legally determinative, dispositive, or paramount" when reviewing the totality of the circumstances, a single factor can be so coercive as to overwhelm other non-coercive factors. *State v. McGinnis*, 290 Kan. 547, 553, 233 P.3d 246 (2010) (quoting *State v. Thompson*, 284 Kan. 763, Syl. ¶ 20, 166 P.3d 1015 [2007]).

Here, inaccurate notice of a consequence for failure to submit to testing is not the only coercive factor. The investigating officer told Johnson and his mother that without the blood test Johnson could face consequences for failure to have an interlock device— implying that the blood test was needed to avoid those consequences. Additionally, from the beginning, the investigating officer told Johnson—and then again told Johnson and his mother—that Johnson would receive paperwork at the hospital about his rights and consent, making Johnson's initial agreement to the blood draw contingent on the paperwork. The officer explained the blood test as customary and that it was what they "tend to do" in these situations; then he told Johnson they were "just going to go that route" (referring to the consent-based blood draw) "because it's easier"—implying there

was a legally permissible but less easy way for the officer to obtain Johnson's BAC. Finally, the officers never told Johnson he could decline the search without legal consequences. Rather, Sergeant Mance told him he would receive legally required information about consent—the information Johnson received wrongly told him he faced legal consequences for refusing to submit to the blood draw and that he could consult a lawyer—after the blood draw was completed. The State has failed to prove that Johnson gave voluntary, knowledgeable, and intelligent consent to the blood draw under the totality of the circumstances.

## II.     THE EXCLUSIONARY RULE

A warrantless search that does not meet any of the exceptions to the warrant requirement (consent; search incident to a lawful arrest; stop and frisk; probable cause plus exigent circumstances; emergency doctrine; inventory searches; plain view or feel; and administrative searches of closely regulated businesses) is impermissible and the resulting evidence is subject to the exclusionary rule. See *State v. Heim*, 312 Kan. 420, 424-26, 475 P.3d 1248 (2020) (discussing application of the exclusionary rule). The exclusionary rule is designed "to deter unlawful searches and seizures by prohibiting the prosecution's use of unconstitutionally obtained evidence." *State v. Perkins*, 310 Kan. 764, 767, 449 P.3d 756 (2019). Here, the district court applied the exclusionary rule to suppress the evidence of Johnson's blood test because it was the product of an unconstitutional search. However, as the State points out, the exclusionary rule is not absolute. See *United States v. Leon,* 468 U.S. 897, 906, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); *Heim*, 312 Kan. at 424-26 (discussing whether *Leon*'s good-faith exception applies when law enforcement reasonably relies on unconstitutional statute).

The State argues that the good-faith exception to the exclusionary rule should apply to permit use of the blood test because the officer's mistaken belief in the need to read the implied consent notices was reasonable. See *Illinois v. Krull*, 480 U.S. 340, 349-

16

50, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987) (discussing application of exception when officer's actions are reasonable). Under the good-faith exception, an officer's reasonable, good-faith reliance on a warrant later determined invalid or a statute later determined unconstitutional would not result in exclusion of the evidence obtained. See *City of Kingman*, 312 Kan. at 412-13 (discussing an officer's reasonableness regarding an implied consent notice). Under those circumstances, when suppression of the evidence would not serve the purpose of the exclusionary rule to prevent unreasonable searches and seizures, the good-faith exception would apply to permit introduction of the evidence at trial. See 312 Kan. at 418. However, here the officers did not reasonably rely on an invalid statute. Rather, they made a mistake about the applicable law under the circumstances.

It was not reasonable for officers to rely on the implied consent statute when they did not have probable cause to believe Johnson was driving under the influence in violation of the law. When police officers validly rely on implied consent, the notices inform an individual of the actual consequences for refusing to consent to the search. See K.S.A. 8-1001(d). But here, where the officers admittedly had no probable cause of Johnson's impairment and thus officers needed Johnson's explicit consent to validly perform the search, it was unreasonable to believe that Johnson must be given inaccurate notice that his refusal would result in legal consequences. It is unreasonable for law enforcement officers to rely on a misunderstanding and misapplication of the law to perform an impermissible search—making the good-faith exception inapplicable here. See, e.g., *State v. Pettay*, 299 Kan. 763, 771, 326 P.3d 1039 (2014) (holding that where the deputy's search exceeded the physical scope authorized by the statute and, necessarily, the authority conferred upon the deputy, the good-faith exception did not apply). Moreover, applying the exclusionary rule here serves the purpose of deterring future law enforcement officers from misapplying the law and providing inaccurate information to drivers or using advisories that threaten inaccurate or illegal consequences for the purpose of more easily obtaining evidence. See *Pettay*, 299 Kan. at 772 ("[T]he

17

State has an obvious interest in ensuring law enforcement officers comply with the plain language of a statute . . . . No other remedy but suppression can effectively serve that interest in this instance.").

CONCLUSION

Under the totality of the circumstances, the State has failed to show Johnson voluntarily consented to the blood draw. The district court's suppression of the blood draw evidence is affirmed.

18